160142 Carlos Maldonado v. Organic LaGrange Eats Good morning Justices. May it please the Court, Counsel. My name is Osvaldo Rodriguez. I represent Carlos Maldonado. I pledged a petition in this matter. And our prayer today is that you would find the Industrial Commission's decision against the manifest with the evidence. And if I may, go into the facts and the medical intertwined with those facts. On April 15, 2005, there was definitely an accident, undisputed, at work. It was in the course of his work. The only question for the Court to interpret is whether there was an aggravation, acceleration, or an exacerbation of his current physical condition at the time. Mr. Maldonado had back surgery in 1993 and then returned thereafter to work, full duty, what was classified as a heavy duty job. On April 15, he had a fall at work, went to the company clinic, went to the company orthopedic doctor, orthopedic doctor sends him to the orthopedic doctor, Dr. Slack, who had done the previous back surgery in 1993. The case is clouded because in 2004, while playing softball, Mr. Maldonado injured his back. The mechanism is not quite clear and the medical records twisted, but he had some type of but what's very key is that he never missed a day of work in 2004 for his back. There was never any recommendation of surgery. It was just medication and two epidural injections. Dr. Slack said you should have some work restrictions during 2004, but the petitioner testified at trial that he did not have any restrictions at work. They were not there. But doesn't the record reflect that he actually was limited, that he engaged in the lighter duty work restrictions for a period of months before he went back to full duty? He was under those restrictions, I acknowledge that, and he did limit his activities, but he still had the same job. He needed assistance on the heavier things. I do agree with that. And also in January of 2005, he was free from any restrictions and he was doing his work without any restrictions. So Dr. Slack, go ahead. Well, I'm sorry. I was just going to say, it seems to me in reading the brief, the thrust of your argument is the comparison of the two MRIs. You've got the August of 2004 MRI and then the June of 2005 MRI. And the August of 2004 MRI shows left-side protrusion and the June of 2005 MRI shows right-side protrusion. And so you're saying Dr. Slack's opinion that it was work-related, this finding should carry the day. But when you look back at the August of 2004 MRI report and Dr. Zelbe's opinion, that MRI also shows right-side disc protrusion. And Zelbe said, so if there was no interval change between August of 2004 and June of 2005, his opinion would be that this was just simply a temporary aggravation. How does the evidence not support Zelbe's opinion in this case? Thank you, Justice Sears. I don't believe this is necessarily a battle between Dr. Zelbe and Dr. Slack. But rather what you mentioned, the MRIs. There are three, in fact. 2004 with the left-sided broad-based paracentral disc at L5-S1. Immediately after the accident, May 3rd, which is in the appendix, there is an MRI. Broad-based right-sided disc protrusion at L5-S1. June 25th, Dr. Slack orders another MRI, this time to contrast. Broad-based right-sided disc protrusion at L5-S1. Those are for diagnosis. All surgeons, as we know, do those before they conduct surgery. Take a look inside the body before they go in. He did have surgery in December of 2005. The thing that puts us over, I think, and why the decision is against the manifest with the evidence is because the surgeon on that day in December, there was an excision of a recurrent disc on the right side. That's what he did. That's what the surgery was. But more importantly, I agree that there's some conflict with the doctors, but he was not able to return. There was a change in his health after... It seems to me your argument is premised on the August 04 MRI not showing a right-side protrusion, but it did. It does say left paracentral. In addition to right-side. Yeah. I mean, it says both left and right. And the symptoms combined with the MRIs after the accident and the actual surgery, I think, outweigh any confusion that there might be between... Well, even taking into account the symptoms, didn't he have a right-side radiculopathy prior to the work accident? In 2004, yes, and it was not severe. And again, the case is cited in the brief, which you are familiar with. I think we established that there was a cause, and there was a subsequent change in this gentleman's health. So you are proceeding on the basis there was an aggravation of a preexisting condition? Absolutely, Your Honor. Because he had a long history of lower back problems, didn't he? He had a history in 1993. He got it taken care of, returned to work. 11, 12 years without any problems. 2004, he begins to have problems. He exacerbates that condition in 2005. What was going on between August the 20th, 2009, when he received medical treatment, and January the 6th, 2011, when he fell on his back in the parking lot? He continued to have pain, continued to follow Dr. Slack. Did he see Dr. Slack in between those two days? I believe he did, Your Honor. Because the commission said he did. I believe that the records... Because before the slip and fall, he had not received medical treatment for his back since August the 20th, 2009. No, he had had doctor's visits, continued pain, and medication. Elzo, how do you respond to the accolades argument that Dr. Zeldin actually reviewed the MRI images and Dr. Slack just reviewed the reports, and therefore Dr. Zeldin's opinion is more reliable? Dr. Slack testified that it was his custom practice to review the MRIs at the hospital. So he did testify that that was his custom practice. Did you review the MRI films? That's my custom practice. Prior at the hospital where they're kept. Did he testify specifically as to reviewing these? He said that it's my custom practice to review them, the MRI reports, at the hospital. That's what he... That's his testimony. Thank you. But again, to Justice Moore, the key thing is the surgery. And then his symptoms alleviated somewhat after the surgery, a right-sided herniated disc. Well, Zeldin thought it was caused by the softball game, right? He put everything on me. So if it was caused by the softball game, how does that square with your argument that the surgery revealed the injury? Is that inconsistent with Zeldin's opinion? Dr. Zeldin's opinions are the same in all cases, Your Honor. They're the same in all cases? He's got a... Can we take judicial notice of that? Pardon? Go ahead. In practicing or reviewing arguments from December 2016, yesterday, exact same opinion from Dr. Zeldin. This is a manifest way to argument. What is it about Zeldin's opinion that supports the decision here, was the basis for the decision? What is it about Zeldin's opinion that is fatally flawed here? What did he rely on that is fatally flawed? He did not take into consideration the MRIs and coupled with the symptoms that he had and the difference in the condition of this worker after this accident. And here again, I'm just not getting this point. When you say he didn't take into account the MRIs, both the August 2004 MRI and the June 2005 MRI, both showed right side disc protrusion. You are pointing out that the August 2004 MRI also showed left side, but it seems like you're ignoring the fact that it also showed right side protrusion. The MRI of 2004 showed more of a left-sided than a right-sided. It did show right side. Pardon? But it did show right side. It's not shown. And when you say Zeldin didn't take into consideration the MRIs, you say that? He did not take into consideration the MRIs along with the aboriginal symptoms. And I would also ask the court to take a look at the surgery that was done because that is an important part of the puzzle and something that the arbitrator had in their mind. And with regards to Dr. Zeldin, the same case, preexisting condition, temporary aggravation, four weeks of physical therapy, no further treatment necessary. But, again, the ad and the applicable case law provides that we have to show that there was a cause, a causative factor that could hit over the edge. And the facts of this case, the actual chronology and the MRIs coupled with the results of the surgery, clearly show that there was a cause, and that's all I'm saying, of the aggravation, acceleration, or exacerbation of his back condition. If I may reserve any other time. You will have time in reply. Thank you. Good morning, Justice. This is Counsel Elizabeth Coppoletti on behalf of the employer. I would respectfully submit that the commission's decision is supported by the manifesto of the evidence and should be affirmed. And it's true, the employer never disputed the accident. This is all about causation. And it's all about the commission weighing the conflicting medical evidence. Dr. Slack held a contrary opinion to that of Dr. Zelby. The commission afforded greater weight to Dr. Zelby's opinion, and Dr. Zelby did review both of the MRIs. In fact, after he initially saw the claimant, he said, look, if I look at the two MRIs and there's some sort of integral change, I would relate it to his work accident. But if I look at the two MRIs and see nothing, see no change, then I would say it has to do with the softball injury. So he asked for the actual films. He reviewed the films, and he said that this herniated disc that's present in June 25th of 2005 was also present immediately following the softball injury. And it's not just the review of the two films. It's actually also the claimant's complaints of symptoms. Immediately following the softball injury, he complained of severe low back pain, which is exactly what he became of after the work accident. Immediately following the softball injury, he complained of right-sided leg complaints, same as right after the work incident. Immediately following the softball injury, he was recommended physical therapy and underwent two epidural steroid injections, the exact same treatment he had following the work incident. And it was the fact that there was no change actually on the MRI films, coupled with his ongoing same complaints of pain and same treatment, that Dr. Gelby said, look, this herniated disc has been here since the softball injury. It's never gone anywhere. And the need for the surgery is causally related to the herniated disc happening in May of 2004. Were there work restrictions imposed after the softball accident? Correct. And what's the evidence in the record that he actually worked under those restrictions? He actually testified that he didn't actually work under those restrictions. I think it's on page 108. He said that I continued to work, you know, his full-duty job. But he did actually have those work restrictions, and he was supposed to go back to the doctor, I believe it was in December, after the last epidural steroid injection. He was supposed to go back in eight weeks' time for the doctor to see him again, and he just never went back. So those restrictions were always there. Certainly he testified that he continued to work, just as after his work incident, actually his restrictions were better than after the softball injury. I mean, he was restricted with a 20-pound restriction after the work incident versus 15 pounds after the softball injury. But he always had those restrictions imposed upon him from the softball injury. I mean, they never were lifted by Dr. Slack. Do Dr. Slack's records indicate that from November of 2005, excuse me, from August of 2004 to January of 2005, that the claimant was performing light-duty work? I'm sorry, I don't know that specifically. They may indicate that. I mean, he testified during the trial that he didn't actually do light-duty work, that he did full-duty work during that period of time. I don't recollect that. And that would further support the employer's position here. Correct. I mean, he said on page, I wrote it down, it was on C-108 of the record, that he continued to work his full-duty job, that he didn't actually undergo the light-duty, that he continued on working, trying to do his job with these ongoing pains. I mean, he was a good worker and he did work. But the fact of the matter is it was a herniated disc happened after the softball injury, and that was what Dr. Zellwey found. And the commission stated in their decision that they afforded greater weight to Dr. Zellwey's opinion. He felt that he had the actual ability to review the MRI films. And I think Justice Moyad asked whether or not Dr. Slatt, in fact, testified as to whether or not he reviewed the films. And he never actually says that. I mean, he says it was his practice, as counsel indicated, but he never said, yes, I actually personally reviewed these films. Whereas Dr. Zellwey did. I mean, he personally actually reviewed the films and states that in his deposition testimony as well as in his reports. And he actually talks about the actual different views of the MRIs. I mean, he actually talks about the actual report, I mean, the actual pictures that he relied on. He talks about T8, I think it is. And so he was specifically comparing the actual films himself and found that that herniated disc was there following the softball injury. In your brief, you're talking about the August of 4 MRI report and the radiologist's notation of the left side disc herniation. And you say maybe the report contained a typo or the report was not complete. The report not being complete part of it, I understand. What's it matter if it showed a left side herniation, if it also showed a right side herniation to Dr. Zellwey's opinion here? I don't think it does. It could be both, right? Correct. Correct. I mean, it could have just been underreported in that radiologist's report. And I think that that's an important fact as well, is that that's just a diagnostic tool. An MRI report is a diagnostic tool, and that's what the doctors rely upon. But they also look at the actual films, which is what Dr. Zellwey did. I'm having trouble with two sentences in the arbitrator's opinion, which the commission adopted. The arbitrator additionally notes that the petitioner sustained an intervening accident to his lumbar spine on January 6, 2011, when he slipped on black ice in a restaurant parking lot. Before that slip and fall, he had not received medical treatment for his back since August 20, 2009. Is it a matter of fact he saw Dr. Slack on February 1, 2010? Correct. He did actually see him that one time, but I don't think he actually, I was looking back, and I don't believe that Dr. Slack recommended any treatment at that point. Yes, he did. He recommended an EMG study. That's correct. I apologize. Yes, he recommended an EMG study. And actually, when he went back and saw Dr. Slack in 2009 initially, and then the EMG study in 2010, he was actually complaining of left leg symptoms. After the slip and fall on January 6, 2011, while at the Baker Square parking lot, his symptoms then changed to the right side of his leg. Well, his complaint on February 1, 2010 was left lumbar radicular symptoms. That was Selby's note. That's right. But he did see a doctor. He did. He did. I think that that was an inadvertent mistake on their part. He did actually see a doctor on February with complaints of the left leg, and an EMG was recommended at that time for those left leg complaints, whereas then when he fell at Baker Square, his back pain became intractable, and he was complaining of right leg symptoms. And, in fact, immediately after that fall at Baker Square, he provided the history that he had had prior back problems but was managing fine and was able to control it with over-the-counter medication. But then after the fall at Baker Square, the pain was so severe he could not handle it any longer, and his pain complaint switched to the right leg as opposed to the left leg. And I think, in a brief, I review the fact that under national frame, there was a clear change in his presentation, his symptomology, the recommended treatment, as well as his worked-out status, which would support the finding that it was, in fact, an intervening accident following the fall at Baker Square. So I would respectfully submit that the commission's decision be affirmed as it is supported by the manifesto of the evidence. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you. What Counsel discussed or briefed is maybe the report contained a typo or the report was not complete. Either way, it's not definitive evidence of a disc herniation. I think the ultimate evidence of a disc herniation is the surgery, where the surgeon actually went in there and excised it. In the back of that, the petitioner did not miss a day of work in 2004. He was holding, as the testimony record says, three jobs, this job, a night security job during the week, and a different security job during the weekend. He was able to function 2004 up to April 15 in doing those three jobs. He only saw Dr. Slack twice in 2004. The testimony at trial said, yeah, it's Dr. Slack getting those restrictions. I continue to do work. I continue to do these jobs. Well, I ask opposing counsel whether or not this is in the record, but did Dr. Slack's records from November of 2005 reflect that your client was performing light duty work in August of 2004 and then returned to full duty work in January of 2005? Your Honor, I believe Dr. Slack, that he did write that down, and that's what the restrictions that were given to the petitioner, those restrictions were never put in place. I'm not saying that he wrote down those were his restrictions. He said that he was actually performing light duty work, but that's what his November of 2005 office notes say. I agree. Okay. So that's different than saying that's only what the restrictions were, but he wasn't performing the work. He did not have knowledge that the work restrictions were not put into practice. But also, Your Honor, I would submit that even if he were working with restrictions at that time, after the state of accident, he was not able to work. So there was a material change after the state of accident, and I believe that that's the burden that I have to show a cause. He was asymptomatic completely. There's no record of any of the treatment from January 2005, four months until the state of accident. Afterwards, extensive medical care, injections, physical therapy, medication, surgeries. The arbitrator's decision says this was a temporary aggravation. There's nothing temporary about it. It lasted three years, and it continues to last. I would submit that the petitioner has met his burden. It shows that that day of accident is a cause, and the decision of the Justice Commission is against the manifest way of the evidence. I thank you for your time. Thank you, counsel. Both of the arguments in this matter will be taken under advisement. Written disposition shall issue.